Dabbs *v.* Dabbs.

5-569                                276 S. W. 2d 73

Opinion delivered February 28, 1955.

[Rehearing denied April 4, 1955.]

*Arthur L. Smith, Jr.*, for appellant.

*Atlee Harris, W. W. Hughes* and *Hugh Stanton*, for appellee.

George Rose Smith, J. This is a bill in equity filed by the appellee, H. R. Dabbs, for the purpose of impressing a resulting trust upon a certain lot in the city of West Memphis. The appellants, Roxie Dabbs and Josephine Dabbs Kehoe, are mentally incompetent sisters of the appellee and have been represented in the case by a guardian *ad litem.* The trial court granted the relief sought. It is now contended that the appellants were not properly served with process and that the proof is insufficient to establish a resulting trust.

Great affection, harmony, and mutual helpfulness have characterized the Dabbs family, which formerly consisted of four brothers and four sisters. In about 1917 Roxie Dabbs, one of the appellants, suffered a nervous breakdown; she has been mentally afflicted ever since. She was committed to the Western State Hospital, in Bolivar, Tennessee, in 1927 and is still a patient in that asylum. Another sister, Bessie Dabbs, was committed to the same institution in 1933, after several years

of mental illness, and remained there until her death in 1939. Throughout those years of misfortune the appellee and his brothers showed the utmost devotion in caring for and maintaining their afflicted sisters.

In 1926 the appellee purchased the lot now in question, for $3,700, and had the deed made to Roxie and Bessie Dabbs. He placed the deed of record and took charge of the property. For a month or two he collected rent, which, as he puts it, ''didn't amount to anything at all,'' but the tenant house on the lot was then condemned by the city. Since then the lot has been vacant, with the taxes being paid by the appellee.

Upon Bessie Dabbs' death intestate her half interest in the land was inherited equally by her seven brothers and sisters. Four of those undivided fourteenth interests have been voluntarily conveyed to the appellee by other heirs; so he has record title to an undivided five-fourteenths. Roxie Dabbs still has her original half interest, plus the one-fourteenth which she inherited from Bessie. The remaining one-fourteenth is owned by a third sister, the appellant Josephine Dabbs Kehoe, who was committed to the Bolivar hospital in 1951.

In 1953 the property was leased to an oil company by the appellee, who signed the lease individually and as guardian for Roxie and Josephine. At about the same time this suit was brought against these two nonresident, incompetent sisters. A warning order was duly published, but it is conceded that the defendants were not personally served with process. It is insisted by the guardian *ad litem* that such personal service is required by our statutes.

In our opinion the service by publication was effective. All the pertinent statutes, except for amendments not now material, were contained in the Civil Code. Sections 59 and 66 of the Code required that a summons be served personally upon a resident defendant. Ark. Stats. 1947, §§ 27-306 and 27-330. There followed, in § 74, a special safeguard for insane persons, the requirement being that service be had not only upon the person under

disability but also upon some one else, such as his guardian, the person having his custody, etc. Ark. Stats., § 27-337. It cannot be doubted that a resident incompetent must be served personally and is entitled to the additional protection afforded by service upon his guardian or other custodian.

Sections 77 and 78 of the Code authorized personal service upon nonresidents, without mentioning insane persons. In the case principally relied upon by the appellants, *Wilder* v. *Wilder,* 208 Ark. 521, 186 S. W. 2d 933, we indicated that personal service upon a nonresident insane person must also comply with § 74 of the Code. But in the *Wilder* case no warning order was issued; so that case does not answer the question now presented.

Sections 79 and 80 of the Code authorized, in the case of a nonresident, service by publication as an alternative to personal service. Ark. Stats., §§ 27-354 and 27-355. It is now insisted by the appellants that when the nonresident is insane the warning order must invariably be accompanied by the service of summons in the manner prescribed by § 74 of the Code. We do not find this contention convincing. If personal service upon a nonresident incompetent is required in every instance, the publication of a warning order in such cases would be completely useless, as the concurrent personal service would alone suffice. To eliminate completely the possibility of effective service by publication against an incompetent nonresident would leave a serious deficiency in the law; for it is easy to think of situations in which personal service might be impossible, as when the defendant's exact address is unknown or when he lives in a foreign country whose laws do not provide for personal service. Only the most explicit statutory language would compel us to reach a conclusion so undesirable in practical effect, and we find no such mandatory provisions in the statutes. To the contrary, the decisions construing a companion section of the Code, applicable to minors under the age of fourteen, indicate that service by publication alone is sufficient. *Williams* v. *Ewing.*

31 Ark. 229; *Freeman* v. *Russell,* 40 Ark. 56; *Nunn* v. Robertson, 80 Ark. 350, 97 S. W. 293, Ann. Cas. 1913E, 1197. The two sections, § 27-336 with reference to minors and § 27-337 with reference to insane persons, are so nearly identical that both must logically be given the same construction.

On the merits, however admirable the appellee's conduct toward his sisters may have been, we cannot conscientiously say that the proof establishes a resulting trust. Such a trust arises when the purchaser of property takes the title in the name of another with the intention of acquiring for himself the entire beneficial interest. It being shown that in this instance the appellee paid the purchase price, the rebuttable presumption of a resulting trust is overcome if the evidence indicates that the appellee did not intend to buy for himself.

Here the difficulty lies in the absence of any plausible reason for the appellee, if he intended to make the lot his own, to put the title in the name of his sisters—at least one of whom was then insane. "It is easier to find a manifestation of intention to make a gift where no probable reason for taking title in the name of a transferee exists other than to give him the beneficial interest than it is where such reason exists." Rest., Trusts, § 441, Comment *b.* Conversely, it is hard to believe that one bent upon buying land for himself would choose an insane grantee as the holder of the bare legal title.

Nor does the appellee's explanation—given with obvious candor—further his case. He says, in substance, that he was attempting to provide his sisters with a source of income and that he was making a contribution to their security in the event anything should happen to him. This attitude strongly supports the inference that a gift was intended; indeed, the desired security for the grantees is exactly what a gift would have accomplished. On the other hand, the existence of a resulting trust would completely defeat the very purposes that the appellee had in mind. For one who creates a resulting

trust is in reality the owner of the property; it is subject to the claims of his creditors and passes to his heirs or devisees at his death. Rest., Trusts, § 407, and Ark. Annotations thereto. Indeed, this case illustrates perfectly the point we are making. It was the appellee's purpose in 1926 to assure his sisters an income. The vacant lot provided no promise of substantial income until the lease to the oil company was executed in October, 1953. In the same month this suit was filed, wherein the finding of a resulting trust would deprive Roxie Dabbs of the revenue that she was meant to have, and thus defeat the objective that motivated the appellee in 1926.

The appellee relies upon *Camden* v. *Bennett,* 64 Ark. 155, 41 S. W. 854, and *Ellis* v. *Shuffield,* 202 Ark. 723, 152 S. W. 2d 535, but neither decision is controlling. In the *Camden* case the grantee, although partly blind, was not insane and therefore could conveniently have held the title for the purchasers. Furthermore, the principal purchaser testified positively that he did not intend to make a gift to the named grantee. In the *Ellis* case, as here, the person asserting a resulting trust had remained in control of the property, but the difference is that there the grantees were competent. Roxie and Bessie Dabbs, however, were unable to look after their land; their brothers had assumed responsibility for their welfare. It was just as natural for the appellee to take care of the lot he had bought for them as it was for him to act for the appellants in executing the 1953 lease—an action which might be said to have been in recognition of their beneficial ownership. More nearly in point than the above cases is our holding in *Eastham* v. *Powell,* 51 Ark. 530, 11 S. W. 823, where a father took title in the name of his insane daughter "as a provision for her on account of her infirmity." We adhere to the view there expressed, that such conduct tends to confirm rather than to rebut the existence of a gift.

Reversed and dismissed.